UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANNE DOWN,

        Plaintiff,

v.

ANN ARBOR PUBLIC SCHOOLS, ET AL,

        Defendants.

_____/

Case No. 14-10086

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [13]**

At a hearing held on July 1, 2014, this matter came before the Court on Plaintiff's motion for a preliminary injunction. (Dkt. 13.) Plaintiff's complaint alleges one federal (violation of Fourth Amendment rights) and one state law claim (violation of Michigan's Persons With Disabilities Civil Rights Act, as amended, Mich. Comp. Laws § 37.1101, *et al.*). Plaintiff's motion seeking a preliminary injunction addresses her federal civil rights claim, brought pursuant to 42 U.S.C. § 1983, alleging that Defendants' requirement that Plaintiff submit to an Independent Medical Examination conducted by a psychologist violates her Fourth Amendment right prohibiting unreasonable searches and seizures.

Plaintiff filed her complaint and initial motion for a temporary restraining order ("TRO") and preliminary injunction on January 9, 2014. (Dkt. 1, 3.) Plaintiff subsequently withdrew her motion for a TRO and preliminary injunction because the parties agreed that the medical examination would be postponed.

On May 22, 2014, Plaintiff filed a renewed motion for a TRO and preliminary

injunction.  (Dkt. 13.)   At a status conference held that same day, the Court informed Plaintiff that her motion for a TRO was denied, and she should proceed on her renewed motion for a preliminary injunction as set out in the Court's detailed Scheduling Order. (Dkt. 15.)  This matter is now before the Court.

Because Plaintiff has not met her burden, her motion for preliminary injunction is DENIED.

## I.   Findings of Fact

1.   Plaintiff Dianne Down applied for a position with the Ann Arbor Public Schools ("AAPS") and was hired in September 1999.  (Def.'s Ex. 501, 9/14/99 Appl.)

2.   Upon being hired, Dianne Down was provided a series of documents, including the master agreement between AAPS and the applicable union.  (Def.'s Ex. 501, 9/14/99 Appl.)

3.   After her first semester of teaching, Ms. Down received a performance review.  It was generally positive, although it stressed certain areas in which improvement was necessary, i.e., that she should "work on classroom management, which would lessen the student/teacher confrontation."  (Def.'s Ex. 502, 12/08/99 Prof. Staff Eval. at 4.)

4.   Out of concern for Plaintiff's continued development and correction of any issues, the AAPS placed Plaintiff on an individualized development plan ("IDP") for the 2000-2001 school year.  (Def.'s Ex. 503, 5/17/01 IDP Type:  Developmental (Probationary).)

5.   On October 22, 2004, the AAPS issued a formal written reprimand to Plaintiff for her conduct toward a particular student.  It summarized an incident involving two students that occurred in Plaintiff's classroom.  Rather than stop the name-calling from the initiating student, Plaintiff joined in against the targeted student, telling him to "Shut up, chipmunk,"

2

which was one of the names the targeted student was called by the initiating student. (Def.'s Ex. 504, 10/22/04 Ltr. of Reprimand from Huron High Sch. Asst. Principal.)

6.   Plaintiff received additional IDPs for the 2004-2005 school year and the 2005-2006 school year.  (Def.'s Ex. 505, 11/22/04 IDP Type:  Enhancement (Tenured teacher wit satisfactory evaluation); Ex. 506, 4/24/06 Prof. Staff Eval.)

7.   Cynthia Ryan, Executive Director of Human Resources for the Ann Arbor School District, testified at the July 1, 2014 hearing.  The Court found her to be a credible witness.

8.   According to Cynthia Ryan's testimony, which this Court found credible, IDPs are not issued for every teacher for each year of their employment.  Rather, they are generally issued only for teachers having difficulty with student/parent complaints about teaching performance and/or class management issues.  Plaintiff's multi-year IDP (Def.'s Ex. 505) was issued because she exhibited areas that needed improvement, i.e., teaching performance and classroom management skills.

9.   During the summer of 2008, Plaintiff was contracted to teach mathematics during summer school.   Several students, however, complained about her performance deficiencies, withdrew from Plaintiff's class, and forfeited their $250 enrollment fees.  The Co-Summer School Principals subsequently informed Plaintiff that "[t]he withdrawal and forfeitures causes a significant adverse effect on students, families, and the Ann Arbor Public School System; and, "[a]s a consequence of your behavior your supplemental contract for summer school teaching programs shall not be renewed." (Def.'s Ex. 507, 10/23/08 ltr. from Co-Summer School Principals.)  It also reminded Plaintiff that she had "been placed on notice, and received Individualized Development Plan goals in the past, to decrease the number of student withdrawals from your classroom." (*Id.*)  As Ms. Ryan

testified at the July 1, 2014 hearing, there were numerous student/parent complaints about Plaintiff's performance and classroom management during summer school in 2008.

10.     On October 23, 2008, Plaintiff received a written letter of reprimand from the Co-Summer School Principals for demeaning behavior directed to students and was "placed on notice that similar incidents in the future could lead to discipline up to and including discharge." (Def.'s Ex. 509, 10/23/08 ltr of reprimand.) The letter of reprimand informed Plaintiff that, on July 16, 2008, a student and his mother filed a formal complaint about Plaintiff's behavior. They characterized Plaintiff as "a very rude teacher" who reportedly interrupted repeatedly in a phone conversation, caused the student to "feel humiliated, ignorant, and stupid" by yelling at him, telling him that hers was not a calculator class, not providing the student with assistance, and embarrassing him by commenting that he probably wanted a bathroom pass so he could make a phone call. (*Id.*) Plaintiff was further notified that she had "continually received reoccurring parental complaints, that she received IDPs for the 2004-2005 and 2005-2006 school years that included the objective of allowing "students to feel free to discuss with teacher areas of concern without feeling demeaned," and was reminded that "[e]stablishing a positive rapport with parents is an integral part of your job duties." (*Id.*)

11.     On October 2, 2008, Plaintiff received a written letter of reprimand from the Assistant Principal of Huron High School, Virginia Bell, for failing "to maintain appropriate standards of professional behavior when you participated in a student conversation about another student's negative behavior" on September 2, 2008. (Def.'s Ex. 508, 10/2/08 ltr. of reprimand.) The letter of reprimand also warned Plaintiff that "[f]ailure to behave in a professional way in the future will result in further discipline up to and including termination."

4

(*Id.*)  Ms. Ryan testified that Assistant Principal Bell investigated the allegations before issuing the letter of reprimand.

12.     On October 8, 2013, Plaintiff met with Dr. Arthur Williams, the Principal of Huron High School.  They discussed various parent and student complaints about her interactions with students.  (*See, e.g.,* Pl.'s Ex. 112-16 through 112-22, parent emails detailing complaints about Plaintiff and inquiring about the School District's response to those complaints.)  Plaintiff submitted a written response to those complaints on October 13, 2013.  (Pl.'s Mot., Ex. 4, 10/13/13 Ltr. Resp. from Plaintiff.)  Ms. Ryan testified that she spoke with Plaintiff about the parent/student complaints in October 2013 and reviewed Plaintiff's written response.

13.     On November 20, 2013, Plaintiff was sent a written letter of reprimand from the Principal of Ann Arbor's Huron High School, Dr. Williams.  (Def.'s Ex. 510, 11/20/13 ltr. of reprimand.)  The letter notified Plaintiff that she was being reprimanded for "inappropriate behavior and failure to exercise the professional judgment of an Ann Arbor Public Schools employee."  (*Id.* at 1.)  Principal Williams informed Plaintiff that he had completed "a thorough investigation of the 16 parent complaints and 8 student complaints that were discussed at a meeting held on October 8, 2013." (*Id.*)  Complaints demonstrating Plaintiff's "unprofessional conduct" were placed into three categories:  (1) Plaintiff's statements during Huron Capsule Night "to multiple parents that you were irritated with Huron High School administration" for assigning you to a teach a certain math class with a curriculum that you had not been exposed to for over 30 years; (2) Plaintiff's "numerous rude, sarcastic and intimidating comments to students when they pose[d] questions to [Plaintiff] about the material;" and (3) Plaintiff's "wasting class time by divulging inappropriate items about [her]

5

own personal life, such as your husband beating you, and a parent relayed that her children felt very insulted when you stated that it was your own personal belief that homosexuality is wrong and should not be accepted." (*Id.*)

Plaintiff was also reminded that this was not her first written reprimand, she had received written reprimands on October 22, 2004; on October 2, 2008; and on October 23, 2008. (*Id.* at 2.)   It concluded by informing Plaintiff that:

> Based upon prior history and this current incident, you continue to display inappropriate behavior despite numerous reprimands.  You are hereby directed to cease and desist any and all comments to parents disparaging Ann Arbor Public Schools and Huron High School and its administration, disrespecting and intimidating students during instructional time and divulging details regarding your personal life to students.  Any failure in this regard will result in further discipline up to and including termination.

(*Id.*)  At the July 1, 2014 hearing, Ms. Ryan testified that she had reviewed this letter of reprimand and agreed with Principal Williams that it should be issued.

14.     On December 6, 2013, a parent emailed Principal Williams, informing him that, while investigating concerns expressed by his daughter, a student in Plaintiff's math class, about Plaintiff's mistreatment of her students, he discovered a web site that contained about 40 negative comments about Plaintiff's classroom behavior that backed up his daughter's concerns.

> I was distressed to find that my daughter's concerns were backed up by uniformly damning reviews posted by Huron students describing verbal abuse (e.g. calling student "whores"), emotional abuse (denigrating comments, racist comments), and even physical abuse (throwing a pencil at a dozing student) during instruction time.  I think it would be well worth the time for each of you to review the 40 odd comments regarding Ms. Down. . . .  I have equally grave concerns about this teacher's competence, and I know that i [sic] am in good company.  I do not want my daughter to return to that classroom . . . .  Please let me know in the next few days what action has been taken to investigate these problems.

6

(Pl.'s Ex. 106, 12/06/13 email chain.)  Principal Williams forwarded the email message to Cynthia Ryan, David Comsa, and Robyne Thompson asking for suggestions on how to respond. (*Id.*)

15.     On December 9, 2013, Cynthia S. Ryan, Executive Director, Human Resources and Employee Relations for Ann Arbor Public Schools, sent Plaintiff a letter informing her that she was "being placed on administrative paid leave of absence effective immediately pending an investigation of allegations of verbal abuse of students."  (Pl.'s Ex. 107, 12/09/13 ltr.)  Plaintiff was further directed "not to contact any students, parents, or staff" and was informed that "[p]ursuant to MCL 750.552 you are also directed not to enter onto District buildings or property" and that she would be notified once the investigation had been concluded.  (*Id.*)

16.     On December 11, 2013, Ms. Ryan sent Plaintiff a letter notifying her that she had been scheduled for an Independent Medical Exam with Dr. Gerald Williams on Friday, January 10, 2014 at 10:00 a.m. and that the exam "takes most of the day." (Pl.'s Ex. 108, 12/11/13 ltr.)

17.     On December 11, 2013, Principal Williams received numerous parent/student emails reacting positively to the School District's decision to place Plaintiff on administrative leave and urging the School Board to make Plaintiff's removal permanent.  Principal Williams forwarded those emails to Cynthia Ryan; David Comsa, J.D., Deputy Superintendent HR/General Counsel; and Robyne Thompson, Executive Director for Secondary Education.  (Pl.'s Ex. 112-1 through 112-13, 12/11/13 email chain.)

18.     Considering the above evidence and the testimony at the July 1, 2014 hearing, this Court finds that there were a large number of parent/student complaints over many

7

years, i.e., from 1999 through December 2013, about Plaintiff's poor teaching performance, classroom management issues, and behavioral issues involving interactions with students/parents.

19.     The 2009-2011 Master Agreement between the Ann Arbor Board of Education and the Ann Arbor Education Association provides, in relevant part, that:

> 4.900 Independent Medical Exam
>
> 4.911 Should the Board or its agent <u>have reason to suspect that a teacher is unable to perform</u> his/her professional duties due to physical, mental, and/or emotional disability, they may demand that said teacher submit to a physical or psychological/psychiatric evaluation. Upon such demand the Association will be notified with permission of the individual. The Board may designate an examiner, who must be a licensed physician, neuro psychologist or allied health care professional, osteopath or psychiatrist and the Board will assume the cost of the examination. When the Board exercises its right for the fitness of duty test, the teacher will be placed on paid administrative leave. Upon receipt of the report by Human Resources and Legal Services a copy will be provided to the teacher. Should the teacher be found not fit for duty, they are eligible to use any days as allowed in the Master Agreement.
>
> An additional examiner may be selected by the teacher at his/her expense. Should the teacher exercise his/her right to select their own examiner whose professional opinion differs from that of the Board's examiner on the issue of fitness for duty, the parties will select a third examiner and share equally in that expense. The parties will be bound by the third examiner's findings on fitness for duty.

(Pl.'s Br., Ex. 3, Master Agreement at 29, ¶ 4.911 (emphasis added).)

20.     The Court interprets the plain language of the Master Agreement § 4.911 to mean that if the School Board or its agent has reason to suspect that a teacher is unable to perform his/her professional duties due to physical, mental, and/or emotional disability,

then they may demand that the teacher submit to a physical or psychological/psychiatric evaluation.

21.     The Court finds that there was reason to suspect that Plaintiff was unable to perform her professional duties and that Defendants properly invoked ¶ 4.911 and directed Plaintiff to submit to a psychological IME.

22.     Ms. Ryan, whose testimony the Court fully credits, testified that the Ann Arbor School District has invoked ¶ 4.911 many times and has requested an IME by a mental health professional, on average, about three or four times a year.

23.     Ms. Ryan also testified that, if concerns arise about a teacher's performance in the classroom, either due to physical, emotional, or mental issues, the teacher is placed on paid administrative leave, ¶ 4.911 is invoked, and the teacher is instructed to attend an IME scheduled by the School District.

24.     Other than Plaintiff's challenge here, no teacher has refused to go to the scheduled IME.

25.     If the teacher does not object, his or her union representative is notified about the impending IME.

26.     Privacy procedures are in place.  After the IME is completed, the doctor sends the results to Ms. Ryan in Human Resources.  The only other School District Official who sees the results is Ms. Ryan's boss, the School District's General Counsel.  Other than Ms. Ryan and General Counsel, the results are shared only with the teacher.  The teacher decides whether he or she wants to share the doctor's report with his or her union representative.  Generally, they agree to share the information with the union.

27.     As set out in ¶ 4.911, procedures exist for the teacher to dispute the IME

9

results. The teacher may obtain a second opinion. And, if a conflict exists between the first and second opinions, then a third medical examiner is chosen by both parties, and that doctor's opinion will be binding.

28.     Ms. Ryan took part in negotiating ¶ 4.911. She explained that its intent is to protect school children, to make sure that teachers are fit for duty, and to make sure that teachers are able to handle the emotional stress of teaching.

29.     Plaintiff testified that she first learned about the scheduled IME from a phone call from Ms. Ryan who told her to expect a letter about her IME. Plaintiff asked Ms. Ryan why the IME was being requested, and Ms. Ryan responded that the School District had concerns, and that she would contact Plaintiff's union representative. Plaintiff testified that Ms. Ryan hung up without giving her the opportunity to object to her union representative being contacted. Plaintiff did not call Ms. Ryan back or otherwise object to having her union representative contacted. In fact, Plaintiff testified that she subsequently spoke with her union representative, Linda Carter, who told Plaintiff to "do it" (to go to the IME) in no uncertain terms.

30.     Plaintiff also testified that, one day earlier, she had spoken with Ms. Carter about her suspension. Ms. Carter informed Plaintiff that she was suspended because she allegedly called someone a whore. Plaintiff denied that she did this.

31.     At the July 1, 2014 hearing, Plaintiff also denied that she derogatorily replied to student remarks with "duh," explaining that she has a hearing condition that causes ringing in her ears and her "huh" must have been misinterpreted by students as "duh." She denied that she yells at students, explaining that her hearing problems cause her to inadvertently speak loudly or raise her voice. She did admit that she called a student a

10

"chipmunk," which gave rise to her October 22, 2004 written reprimand.

32.     At the hearing, when asked about the November 20, 2013 reprimand letter, Plaintiff denied that she told parents that she was irritated by the School Administration's decision to place her in her current math class.  She denied that she wasted class time talking about personal matters.  She denied that she told students that her husband beat or abused her.  She denied that she ever told a student or parent about her personal beliefs about homosexuality.  She denies that she made derogatory remarks to her students like "what drug are you on."

33.     When asked about the suggestion on her 1999 Evaluation, her first year of teaching in the Ann Arbor School District, that she "should work on classroom management, which would lessen the student/teacher confrontation," Plaintiff explained that she was hired the 11th day of school, after the class had had five substitutes, and had to fight an uphill battle the rest of the year to manage the students.

34.     This Court finds that, at the July 1, 2014 hearing, Plaintiff  was defensive and not fully credible; she was unable to fully acknowledge her long history of difficulties and problematic interactions with students and parents about her teaching performance and class management skills.  The Court believes that Plaintiff believes what she is testifying to but is concerned that there may be issues that are preventing her from being the most effective teacher she could otherwise possibly be.

35.     The Court finds that Plaintiff has a long history of difficult and problematic interactions with students and complaints from parents, beginning in 1999 when she was first employed by the Ann Arbor Public Schools and lasting up until the time she received notice of the scheduled IME in December 2013.

11

36.    The Court finds that Plaintiff was unable to acknowledge these difficulties and deal with them in the most effective manner, a manner which would permit her to exercise her best teaching practices and control of her class and allow her to interact with students in a positive way, a way that produces positive educational value.

37.    The Master Agreement (or CBA) at ¶ 4.911 establishes the right of the School District to order an independent medical examination by a psychologist.

38.    Ms. Ryan testified that this provision (¶ 4.911) has been invoked many times since 2007 when she was first hired by the Ann Arbor Public Schools; that it has been invoked many times for mental health; that no teacher has refused to undergo an IME; that the School District's policies reflect sensitivity to privacy concerns; that the results of the IME are not disseminated or distributed or shared with anyone other than the teacher, Ms. Ryan, and her boss, who is the District's General Counsel, unless the teacher requests that the IME results be shared with the union.

39.    Given the long history of issues that have evolved with Plaintiff over the years, the long history of parent complaints and student difficulties, including the summer school problems which seem particularly difficult, the Court finds that the Ann Arbor Public Schools have established that it is reasonable for them, under these circumstances, to require Plaintiff to undergo an IME to see if there is some medical or mental or emotional condition which is preventing Plaintiff from becoming an effective teacher and performing her teaching job.  The Ann Arbor Public Schools have satisfied the requirement for invoking ¶ 4.911 by showing that it had reason to suspect that Plaintiff was unable to perform her

professional duties due to physical, mental, and/or emotional disability.[1]

## II.   Preliminary Injunction Standard

As the Sixth Circuit recently stated in a unanimous en banc decision, the district court must balance the following four factors when considering a motion for preliminary injunction:

> (1)  whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Emps. Assoc. v. Schimmel*, ___ F.3d ___ , 2014 WL 1758913, at *2 (6th Cir. May 5, 2014) (en banc) (internal quotation marks and citations omitted).

The Sixth Circuit also stated its standard on review:  "Whether the movant is likely to succeed on the merits is a question of law we review de novo.  We review for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief.  This standard is deferential, but the court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact."  *Id.*

## III.   Analysis

### A.  Burden of Proof

"The party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success."  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).  It is Plaintiff's burden to prove that Defendant did not have a

---

[1]In light of the Court's findings and conclusions of law, there is no need to address Defendants' "waiver" argument (Resp. at 8-11).

13

reason to suspect Plaintiff could not perform her teaching responsibilities and thus ordered the psychological examination as allowed under the Master Agreement, ¶ 4.911.

## B. Likelihood of Success On the Merits

Plaintiff has not shown that requiring a public school teacher with Plaintiff's record to submit to an IME with a psychologist is an unreasonable search in violation of her Fourth Amendment rights. Moreover, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Assoc.*, 2014 WL 1758913, at *2 (internal quotation marks and citations omitted).

Contrary to Plaintiff's arguments here, an Independent Medical Examination by a psychologist under the facts presented here is not an unreasonable search. Contrary to Defendants' argument, however, this Court does not predict that the Sixth Circuit will follow the Seventh and hold that a psychological examination does not constitute a search for Fourth Amendment purposes. Rather, the Court predicts that the Sixth Circuit will find that a compelled psychological examination is a search for Fourth Amendment purposes.

Applying the relevant law to the facts presented here, Plaintiff has a diminished expectation of privacy because, as a school teacher, (1) she is employed in a safety-sensitive position in a highly regulated industry and plays a unique role in the lives of school children; and (2) her union contract provides for psychological examinations. In contrast, as evidenced by the decisions discussed below, the School District's interest in ensuring a safe, effective, and productive educational environment is strong. Balancing Plaintiff's privacy interests against Defendants' interests results in a conclusion that Plaintiff's constitutional rights were not violated. Plaintiff has not been able to prove (as is her burden

14

on a motion for preliminary injunction) that Defendants' request that she submit to a psychological IME was unreasonable.  Reasonableness, not necessity is the test.

The precise issue presented in this case is apparently a matter of first impression in the Sixth Circuit.  The Sixth Circuit and other federal courts, however, have dealt with substantially similar issues.  In the Sixth Circuit, the closest case addresses drug testing of teachers.  *See Knox Cnty. Educ. Assoc. v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361 (6th Cir. 1998).

In *Knox*, the Sixth Circuit held that drug testing constituted a search for Fourth Amendment purposes.  It then determined whether the school board's policy of suspicionless drug testing of teachers was reasonable and thus constitutional.  To do so, the *Knox* court balanced the government's interest in testing against the individual teacher's privacy expectations.  *Id.* at 373.  It concluded that suspicionless drug testing of teachers was constitutional because the government's interest in testing individuals who held "safety-sensitive" positions and played a unique role in the lives of school children outweighed the teacher's privacy interests which had been "diminished by their participation in a heavily regulated industry and by the nature of their job. . . ."  *Id.* at 379.  In *Knox*, the Sixth Circuit also considered the school district's suspicion-based drug testing policy and similarly found that it too was constitutional.  *Id.* at 384-85.

There is no Sixth Circuit decision addressing psychological testing of teachers.  The decision most directly on point comes from the Western District of Pennsylvania.  In *Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178 (W.D. Pa. 1991), the district court considered and rejected the plaintiff teacher's fourth motion for a preliminary injunction seeking to enjoin the defendant school board from requiring her to attend a psychiatric examination.

15

*Id.* at 1179.  After rejecting the plaintiff's argument that the exam was retaliatory, the court focused on plaintiff's argument (similar to Plaintiff's argument here) that "a compelled psychiatric examination is an unconstitutional search and seizure in violation of the Fourth and Fourteenth Amendment."  *Id.*  Based on testimony provided at the motion hearing, the court credited the defendant school board's witnesses' testimony about the reasons for seeking a psychiatric examination of the plaintiff teacher, i.e., the "growing concern about [the plaintiff teacher]'s ability to interact with others and fitness to teach, and because of [the plaintiff teacher]'s almost unique history of prolonged absences from work."  *Id.* at 1180.

The *Murray* court then applied the relevant law to its factual findings.  It examined the Third Circuit and United States Supreme Court decisions regarding employee privacy.  It determined that "Supreme Court decisions make it explicit that the School Board's collection of medical information from a teacher must be analyzed by balancing 'the individual's privacy expectations against the Government's interests,' [*National Treasury Employees Union v.] Von Raab*, 489 U.S. [656], 665 [(1989)], in light of the Fourth Amendment's prohibition of unreasonable searches and seizures."  *Id.* at 1181.

From the Supreme Court and Third Circuit's decisions, the *Murray* court determined that the following factors are to be considered when balancing the plaintiff's privacy expectations and the government's interests:  (1) the "type of information requested;" (2) the "potential for harm from nonconsensual disclosure;" and (3) the "degree of need for the information, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward disclosure."  *Id.* at 1181-1183. The *Murray* court acknowledged that, similar to here, it was "not being asked to determine

16

the constitutional adequacy of the <u>procedure</u> for deciding whether to seek an examination." *Id.* at 1183 (emphasis added).

As to the first factor, the district court determined that "[t]here can be do doubt that medical and particularly psychiatric information are of the types most associated with expectations of privacy." *Id.* at 1181 (citations omitted). Nonetheless, the court further observed that it must also recognize "that psychological testing and psychiatric interviews are routine features of occupations which involve stress and sensitive interpersonal contact." *Id.* at 1181. The court discredited the plaintiff's testimony that her "medical and psychological information is dear to her personally," finding that testimony "greatly diminished when one considers that [the plaintiff] ha[d] indicated throughout that she [was] willing to provide information compiled by *her* internist and *her* psychologist and *her* therapist." *Id.*

As to the second factor, the potential for harm from disclosure, the *Murray* court concluded that "[t]he harm likely to occur from nonconsensual disclosure is embarrassment and disclosure of sensitive personal information, which [the court] would rank as an exceptionally serious matter." *Id.* It then found, however, that "the evidence given at the preliminary injunction hearing" satisfied the court that "the risk of nonconsensual disclosure" was "sufficiently small that the danger can be disregarded." *Id.* It made this finding because (1) the plaintiff presented no evidence of nonconsensual disclosure; (2) the defendant school board showed that there was no dissemination to the school administration, teachers' union, or public and was not made part of an employee's personnel file; rather, the full report was kept in the School Board's separate medical unit and a summary "from the examining physician with a recommendation as to the employee's

17

fitness to return to work" may be received by others.  *Id.*  The *Murray* court rejected the plaintiff teacher's argument that "a compulsory examination is *per se* unconstitutional," and found that "the confidentiality practices observed by the School Board's medical unit" was sufficient.  *Id.*

As to the third factor, the degree of need for the information, the *Murray* court observed that "[t]here is ample reported precedent for the proposition that medical information, and particularly psychiatric information, is legitimately sought by a school board from teachers who on a daily basis are charged not just with interacting with students but also with shaping the course of their lives."  *Id.* at 1183 (citing *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir. 1988)).  It further observed "[t]hat there is a recognizable public policy favoring the disclosure to school administrators of medical and behavioral information concerning a teacher's actual or potential problems can be seen most easily by examination of the consequences of failure to investigate problem areas."  *Id.* (citation omitted).

In *Daury*, the First Circuit case that the *Murray* court relied upon, a school principal brought a § 1983 action alleging substantive due process violations of his privacy and liberty interests against a school committee's order that he undergo a psychiatric examination as a condition for his continued employment.  In reviewing the district court's grant of summary judgment in the school committee's favor, the First Circuit acknowledged that the school principal had a constitutional right to privacy but that privacy right "must often give way to considerations of public interest."  *Daury*, 842 F.2d at 13.  The *Daury* court further observed that "there is a legitimate public interest in providing a safe and healthy educational environment."  *Id.* at 14.  The First Circuit held that there was no constitutional violation in the school committee's requiring the plaintiff to see a psychiatrist.

18

"A school committee . . . may justifiably compel a teacher or administrator to submit to a psychiatric examination as a condition of continued employment if the committee has reason to believe that the teacher or administrator may be jeopardizing the welfare of students under his or her supervision." *Id.* (emphasis added).  The First Circuit reasoned that "[t]he committee simply sought a professional opinion to insure that Daury would not, if he returned to work, jeopardize the school system's interest in providing a safe and healthy educational environment.  And Daury offered no specific evidence contradicting the committee's position that it had a reasonable basis for concern." *Id.* (internal citation omitted and emphasis added).

In a non-school public employee setting, the Ninth Circuit Court of Appeals addressed the issue "whether the state may compel an employee with a prolonged and egregious history of absenteeism and a record of on-the-job illnesses to undergo a fitness-for-duty medical examination." *Yin v. State of California*, 95 F.3d 864, 866-67 (9th Cir. 1996).  In *Yin*, a tax auditor for the State of California Employment Development Department, brought suit against her state employer alleging that "requiring her to submit to an unwanted medical examination would violate both the American with Disabilities Act (the ADA), . . . and the Fourth Amendment." *Id.* at 867.  As to the plaintiff's Fourth Amendment challenge, the Ninth Circuit rejected her claims that requiring her to undergo an IME absent a warrant violated the Fourth Amendment. *Id.* at 869.  Citing various Supreme Court decisions, the *Yin* court observed that "neither probable cause nor a warrant is required when 'special needs, beyond the need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* (citations omitted).  It further observed that "[i]n 'special needs' cases . . . the Court dispenses with the probable cause and warrant requirements

19

and simply applies a balancing test to determine if the search or seizure is reasonable and thus constitutional." *Id.* (citations omitted).

Considering the facts presented in *Yin*, the court determined that "individualized suspicion" clearly existed. *Id.* at 869 n. 9 (citing the relevant union contract allowing the state to require a medical examination when it believes an employee is unable to perform his or her normal work duties due to illness or injury). Concluding that "requiring someone to submit to a medical examination" is a search for Fourth Amendment purposes "whether or not that examination entails any particularly intrusive procedures," the Ninth Circuit next determined whether the search was reasonable. *Id.* at 870, 871. It did so by balancing the plaintiff's privacy interests "against the government's interest in the search." *Id.* at 870 (citations omitted). It observed that, "[n]otwithstanding Yin's assertion to the contrary, the government does not have to use the least restrictive means to further its interests. Nor must the government establish a 'compelling state interest,' in the sense of an absolute quantum of interest to justify the search or seizure." *Id.* (internal citations omitted). The *Yin* court found that several factors diminished the plaintiff's expectation of privacy in not being subjected to a medical examination: (1) she, like any employee, had "a somewhat reduced expectation of privacy in the workplace;" (2) there was a California statute that authorized medical examinations of civil service employees like the plaintiff; (3) her union contract provided for independent medical examinations; and (4) the plaintiff's "own experiences at the work-site," i.e., her large number of absences and "repeated episodes of on-the-job illness" converted the status of her health "into an issue of legitimate concern for her supervisors, because it bears closely on her ability to perform her job." *Id.* at 871-72. After concluding that the state had an "interest in assuring a productive and stable work force,"

20

the Ninth Circuit then balanced the plaintiff's "diminished expectations of privacy against the state's interest, and concluded that "the state's interest that Yin submit to an independent medical examination is reasonable and therefore constitutional." *Id.* at 973.

Defendants rely on two decisions from the Seventh Circuit to support their argument that a psychological examination is not a search for Fourth Amendment purposes because it does not involve physical touching, like in drug or alcohol testing. *See Brewer v. Wisconsin Bd. of Bar Examiners*, 270 F. App'x 418 (7th Cir. 2008) (per curiam); *Greenawalt v. Indiana Dep't of Corr.*, 397 F.3d 587, 589 (7th Cir. 2005).

In *Brewer*, an applicant to the Wisconsin State Bar filed an action against the state bar, the state board of bar examiners, the state supreme court, and various state officials, asserting § 1983 and other claims and alleging that the state board of bar examiners' request that she undergo a psychological evaluation as a precondition to evaluating her bar application violated her Fourth Amendment rights. *Brewer*, 270 F. App'x at 420. Plaintiff "ha[d] a mental disability" and "[was] a graduate of the University of Wisconsin's Law School and "disclosed in her application for admission to the Wisconsin Bar that the Social Security Administration had certified her as disabled" based in part on her "chronic depression and fatigue, for which she currently receive[d] no treatment or medication." *Id.* at 419-420. "The district judge dismissed all of [the plaintiff's] claims except for those seeking injunctive relief under the ADA." *Id.* at 420. On appeal, the Seventh Circuit quickly disposed of the plaintiff's § 1983 claims under the Fourth and Fourteenth Amendment. As to the plaintiff's Fourth Amendment claim, the court held that "a psychological evaluation is not a 'search' for Fourth Amendment purposes." *Id.* (citing *Greenawalt*, 397 F.3d at 589-

21

90).

In *Greenawalt*, the plaintiff, a research analyst at the Indiana Department of Corrections, "was told that to keep her job she would have to submit to a psychological examination." *Greenawalt*, 397 F.3d at 588. The plaintiff complied and subsequently filed suit under § 1983 alleging "that the test, which lasted two hours and inquired into details of her personal life, constituted an unreasonable search in violation of her Fourth Amendment right to be free from unreasonable searches and seizures." *Id.* The district court dismissed the plaintiff's action on the pleadings. *Id.* She appealed.

The Seventh Circuit first concluded that, although the district "judge was mistaken about the defendants' immunity from the injunctive relief sought, because the defense of official immunity is applicable only to liability for damages," "the error was of no consequence because section 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity." *Id.* at 589. The *Greenawalt* court then considered the plaintiff's damage claims against the two individual defendants.

It considered "whether subjecting a public employee to a probing psychological examination is a search." *Id.* And, "[i]f it is, then it may well have been an unreasonable one in this case, and thus have violated the Fourth Amendment, because Greenawalt is merely a researcher" who "has no contact with prisoners, is not armed or privy to state secrets, and has no other powers or opportunities so far as we can tell, that would warrant imposing such a condition of employment, unlike cases such as . . . *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir. 1988) (school administrator). . . ." *Id.* The Seventh Circuit never reached the second question because it determined that a psychological test was not a search for Fourth Amendment purposes. *Id.* at 589.

22

The *Greenawalt* court acknowledged that "[a]lmost any quest for information that involves a physical touching, which a test does not, is nowadays deemed a 'search' within the meaning of the Fourth Amendment, which the Fourteenth Amendment has been interpreted as making fully applicable to state action." *Id.* (citing decisions holding breathalyzer, blood and urine testing to constitute a search for Fourth Amendment purposes). It further acknowledged that "[t]he invasion of privacy caused by submitting to the kind of psychological test given to the plaintiff in this case may well have been more profound than the invasion caused by a blood test, breathalyzer test, or a urine test. . . ." *Id.* at 590. Moreover, even though the plaintiff had consented to take the test, the court observed that "had she not done so she would have lost her job, which, if she had a constitutional right not to take the test, would place a heavy burden on the exercise of her constitutional right." *Id.*

Despite numerous decisions observing that the "Fourth Amendment is intended to protect privacy, the Seventh Circuit found that conclusion "historically inaccurate" and explained that "it is not uncommon for constitutional provisions to be supplied with rationales that the framers and ratifiers of the provisions would not have recognized." *Id.* The *Greenawalt* court did "not think that the Fourth Amendment should be interpreted to reach the putting of questions to a person, even when the questions are skillfully designed to elicit what most people would regard as highly personal private information." *Id.* Similarly, the Seventh Circuit observed, it has held "that asking a question of a person already in custody is not a 'seizure' of the person within the meaning of the Fourth Amendment." *Id.* at 591.

The *Greenawalt* court concluded that "[t]he Fourth Amendment was not drafted, and

23

has not been interpreted, with interrogation in mind." *Id*. It then observed that this did not leave the plaintiff without a remedy, just not a constitutional remedy. "Our conclusion that the plaintiff has not stated a Fourth Amendment claim does not leave people in her position remediless – or indeed leave her remediless. States are free to protect privacy more comprehensively than the Fourth Amendment commands; and Greenawalt is free to continue to press her state-law claims in state court, where they belong." *Id*.

Similar to here, the plaintiff in *Greenawalt* did not raise any due process claims. The court thus had only her Fourth Amendment claim before it. *Id*. at 592. As to that claim, it observed that "the Fourth Amendment does not expand accordion-like to fill what may be a gap in the privacy law of a particular state." *Id*. at 591. Moreover, "the Fourth Amendment does not provide a remedy for the unpleasantness of being subjected to a psychological test, and that if we are wrong still there is no doubt that the existence of such a remedy was not clearly established when this suit was filed." *Id*. at 592.

As stated above, this Court predicts that the Sixth Circuit will find that a compelled psychological examination is a search for Fourth Amendment purposes. Moreover, as discussed above, balancing Plaintiff's privacy interests against Defendants' interests results in the conclusions that Defendants' request that Plaintiff submit to a psychological examination is reasonable, and Plaintiff's Fourth Amendment rights were not violated.

### C.  Irreparable Harm and Public Interest

Contrary to Plaintiff's arguments here, an Independent Medical Examination by a psychologist under the facts presented here is not an unreasonable search. In light of this Court's conclusion that Plaintiff's Fourth Amendment rights were not violated, Plaintiff cannot establish irreparable harm. Granting an injunction blocking the School District from

24

requiring Plaintiff to submit to a psychological exam, however, would harm the public's interest in ensuring that public school teachers are fit for duty in their safety-sensitive positions so as to provide public school students with a safe, positive, and productive educational environment.

**IV**.  **Conclusion**

For the foregoing reasons, Plaintiff's motion for preliminary injunction is DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 7, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 7, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager