UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANNE DOWN,

    Plaintiff,

v.

ANN ARBOR PUBLIC SCHOOLS, ET AL,

    Defendants.

                                      /

Case No. 14-10086

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [41]**

In January 2014, Plaintiff filed this civil rights action against her employer, Ann Arbor Public Schools, and its director of human resources, Cynthia Ryan (collectively "Defendants"), asserting claims under the Fourth Amendment and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") as amended, Mich. Comp. Laws § 37.1101, *et al*. The viability of Plaintiff's complaint depends, in large part, on whether a school board may lawfully compel a teacher with a prolonged and particularly egregious disciplinary record to submit to a psychological evaluation. According to Plaintiff, requiring her to participate in this process amounts to an unreasonable search and seizure that was not warranted under the terms of the Collective Bargaining Agreement in the first place.

Currently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff's response to Defendants' motion includes a request for partial summary judgment with respect to her PWDCRA claim. While

procedurally improper,[1] the Court need not consider Plaintiff's argument in light of its decision here.

## I. BACKGROUND

A brief foray into the procedural history of this case provides some helpful context. On or around December 9, 2013, Defendants informed Plaintiff that she was "being placed on administrative paid leave of absence effective immediately pending an investigation of allegations of verbal abuse of students." (Defs.' Mot. Ex. 11, Letter, Dec. 9, 2013). Two days later, Defendants mailed Plaintiff a letter instructing her to appear for an Independent Medical Exam ("IME") designed to assess whether she was mentally fit for the professional duties associated with teaching at the high school level. (*Id.* at Ex. 12, Letter, Dec. 13, 2013). Shortly after receiving the letter, Plaintiff filed the instant action alleging that "Defendants [were] violating [her] privacy interest by requiring her to submit to an unreasonable search . . . ." (Compl. ¶ 50).

In May 2014, Plaintiff filed a request seeking to prohibit Defendants from moving forward with the IME. After conducting an extensive evidentiary hearing and considering the testimony of several witnesses--including Plaintiff--the Court ultimately concluded that:

> Given the long history of issues that have evolved with Plaintiff over the years, the long history of parent complaints and student difficulties, including the summer school problems which seem particularly difficult, the Court finds that the Ann Arbor Public Schools have established that it is reasonable for them, under these circumstances, to require Plaintiff to undergo an IME to see if there is some medical or mental or emotional condition which is preventing Plaintiff from becoming an effective teacher and performing her teaching job. The Ann Arbor Public Schools have satisfied the requirement

---

[1] Pursuant to Rule 5 of the Electronic Filing Policies and Procedures governing the Eastern District of Michigan, "a response or reply to a motion must not be combined with a counter-motion."

>for invoking ¶ 4.911 [of the CBA] by showing that it had reason to suspect that Plaintiff was unable to perform her professional duties due to physical, mental, and/or emotional disability.

(Order, July 7, 2014, Dkt. 33 at ¶ 39). With respect to Plaintiff's Fourth Amendment claim, the Court further held that "Plaintiff has not shown that requiring a public school teacher with Plaintiff's record to submit to an IME is an unreasonable search . . . . " (*Id.* at 14). In light of the Court's decision--and the close of the discovery period--Defendants argue that this matter is now ripe for adjudication on the merits.

## II. FACTS

The facts giving rise to Plaintiff's complaint were throughly documented in the Court's order denying her motion for a preliminary injunction. *See* (Order, July 7, 2014, Dkt. 33). Based on the parties submissions here, it is clear that the record has not evolved in any material way since that time. Accordingly, except where otherwise noted, the Court relies on--and incorporates--its previous findings of fact.

In summary, Plaintiff has been a high school teacher at Ann Arbor Huron High since 1999. During that time, her relationship with the students, parents, and Ann Arbor Public Schools ("AAPS') administration slowly degraded to the point of no return. Indeed, Plaintiff's tenure was plagued by formal reprimands, individualized development plans, and, perhaps most notably, a small army of vocal parents who actively campaigned for her termination based on the negative experiences of their children. While the record is replete with examples of Plaintiff's unprofessional conduct--including, by way of example, telling one student to "shut up, chipmunk" (Defs.' Mot. Ex. 4, Letter of Reprimand, Oct. 22, 2004), and asking another "what drug" they were on in response to a question (Ex. 9, Letter of Reprimand, Nov. 20, 2013)--things officially came to a head in December 2013 following

an email from a concerned parent to Arthur Williams, principal of Huron High. In it, the parent notes that they were "distressed to find that my daughter's concerns [about Plaintiff] were backed up by uniformly damning reviews posted by Huron students describing the verbal abuse (e.g. calling students "whores"), emotional abuse (denigrating comments, racist comments), and even physical abuse (throwing a pencil at a dozing student) during instruction time." (Ex. 10, Parent Email, Dec. 6, 2013). The "reviews" referred to in the email were posted on a website known as www.ratemyteachers.com; an internet forum allowing students to submit anonymous feedback about their teachers. *See id.*

Following Mr. Williams' review of the website--which, according to the email, included "40 odd comments" about Plaintiff--he escalated the issue to AAPS' director of human resources, Cynthia Ryan. Within days, Ms. Ryan placed Plaintiff on administrative leave and scheduled her for an IME with Dr. Gerald Williams. (Ex. 12, IME Letter, Dec. 11, 2013). To date, Plaintiff has refused to participate in the IME- an evaluative process that is explicitly authorized under the Collective Bargaining Agreement ("CBA"); a formal agreement governing the relationship between AAPS administration and union employees.[2] *See* (Ex. 1, CBA Agreement, ¶ 4.911) ("Should the Board or its agent have reason to suspect that a teacher is unable to perform [her] professional duties due to . . . [an] emotional disability, they may demand that said teacher submit to a physical or psychological/psychiatric evaluation.").

Plaintiff, for her part, does not dispute that her behavior resulted in multiple

---

[2] While Plaintiff claims that AAPS has since "abandoned" the IME, the record fails to support that assertion. In fact, Plaintiff's counsel specifically informed Defendants that "[d]uring the pendency of the appeal, my client does not intend to appear for an IME." (Defs.' Reply, Ex. A).

4

admonishments from AAPS and created a hostile environment for many of her students. Nevertheless, she argues that "a jury could reasonably conclude that Defendants had no good faith belief that a psychological examination was necessary, and instead was merely a stratagem to appease a group of increasingly vocal and militant group of parents determined to have [her] removed." (Plf.'s Resp. 13). The Court considers this argument in the context of Plaintiff's Fourth Amendment and PWDCRA claims.

## III.  STANDARD OF REVIEW

The Sixth Circuit employs the familiar standard for summary judgment, namely, that summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their]

5

favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## IV. ANALYSIS

### A. Fourth Amendment

As both parties acknowledge, the Court, in its order denying Plaintiff's motion for a preliminary injunction, thoroughly discussed the state of the law with respect to Fourth Amendment challenges to compelled psychological examinations of public sector employees. *See* (Order, July 7, 2014, Dkt. 33 at 14-24). More specifically, the Court concluded that, while it "predicts that the Sixth Circuit will find that a compelled psychological examination is a search for Fourth Amendment purposes", "Plaintiff has not shown that requiring a public school teacher with Plaintiff's record to submit to an IME with a psychologist is an unreasonable search in violation of her Fourth Amendment rights." *Id.* at 14. With respect to the first layer of the Court's analysis, Defendants have failed to introduce any new authority suggesting that the Sixth Circuit would decide the "search" issue any differently. For that reason, the Court is satisfied that a compelled psychological exam is a search for Fourth Amendment purposes.

Having determined that the IME is a search, the Court must "balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Knox Cnty. Educ. Assoc. v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 370 (6th Cir. 1998) (citations and quotations omitted). Once again, the Court carefully considered this question at the preliminary injunction stage, finding that:

> Plaintiff has a diminished expectation of privacy because, as a school teacher, (1) she is employed in a safety-sensitive position in a highly regulated industry and plays a unique role in the lives of school children; and (2) her union contract provides for psychological examinations. In contrast, . . . the School District's interest in ensuring a safe, effective, and productive educational environment is strong. Balancing Plaintiff's privacy interests against Defendants' interests results in a conclusion that Plaintiff's constitutional rights were not violated.

(Order, July 7, 2015, Dkt. 33 at 14). Plaintiff does not take issue with the Court's balancing analysis, but argues that "[a] jury can reasonably conclude that nothing in the complaints or Plaintiff's behavior . . . led [Defendants] to believe that Plaintiff suffered from any impairment warranting [a] psychological examination." (Plf.'s Resp. 15). In other words, Plaintiff appears to be arguing that Defendants failed to follow the standard set forth under the CBA before scheduling the IME. The record belies this contention.

Under the terms of the CBA, where the Board has "*reason to suspect* that a teacher is unable to perform [her] professional duties due to . . . [an] emotional disability, they may demand that said teacher submit to a physical or psychological/psychiatric evaluation." (Ex. 1, CBA Agreement, ¶ 4.911) (emphasis added). Notwithstanding the exceedingly low burden imposed on the Board, the evidence in support of Defendants' decision to move forward with the IME was overwhelming. As of December 11, 2013--the date AAPS informed Plaintiff that she was scheduled for an IME--Plaintiff had been formally reprimanded on at least four occasions for a wide variety of erratic behavior. *See* (Defs.' Mot. Exs. 4, 7, 8, 9, Written Reprimands). While Defendants could have moved forward with the IME after any one of these reprimands, they continued to give Plaintiff the opportunity to correct her behavior- and, in fact, developed a number of "individualized development plans" geared towards aiding her progress in the classroom. (*Id.* at Exs. 3,

7

5). Indeed, as early as 2004 Plaintiff was warned that she needed to "[c]reate a classroom environment where students feel free to discuss with the teacher areas of concerns without students feeling *demeaned* or unable to work with teacher." (*Id.* at Ex. 5, p. 2) (emphasis added) (recommending that Plaintiff "[l]isten for how [she] say[s] things (angry? [s]harp? [s]arcastic?). The review went on to note that Plaintiff needed to work on "[decreasing] the number of student complaints[]" and reducing "the number of requests to be moved to another mathematics class due to teacher related reasons." (*Id.*). Worthy of note, Plaintiff's signature appears on each of the improvement plans, and she does not contest receiving the various letters of reprimand.

Finally, on December 6, 2013, after receiving yet another scathing email from a concerned parent–incorporating "40 odd comments" from various students–about Plaintiff's behavior, Defendants were left with no choice but to explore their options under the CBA. As such, the Court is satisfied that the Board had "reason to suspect" that Plaintiff might be suffering from some degree of emotional impairment on or before the date the IME was scheduled. Accordingly, Plaintiff has failed to raise an issue of genuine material fact with respect to her Fourth Amendment claim.

### B. Michigan's Persons with Disabilities Civil Rights Act

Finally, Plaintiff alleges that Defendants violated her rights under the Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") which provides, in relevant part, that "[t]he opportunity to obtain employment . . . without discrimination because of a disability is guaranteed . . . ." Mich. Comp. Laws § 37.1102(1). As Defendants accurately point out, the viability of this claim hinges on whether Plaintiff suffers from a disability that is recognized under the PWDCRA. The Court finds that Plaintiff has fallen far short of the

mark in this regard.

"[L]ike the ADA, the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job." *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). To establish a prima facie case under the PWDCRA, Plaintiff must show that (1) she is disabled "as defined in the act," (2) that her disability "is unrelated to [her] ability to perform [her] job duties, and (3) that [s]he has been discriminated against in one of the ways delineated in the statute." *Id.* (internal quotation marks and citation omitted). "Disability" as defined in the PWDCRA, means a "determinable physical or mental characteristic of an individual, which may result from . . . injury, . . . if the characteristic . . . substantially limits 1 or more of the major life activities of that individual." Mich. Comp. Laws § 37.1103(d)(i)(A). Alternatively, a plaintiff can demonstrate a disability if she can show that she is "regarded as having a determinable physical or mental characteristic" as described in the act. *Id.* at § 37.1103(d)(iii).

Michigan has adopted a three-pronged test used by the federal courts in ADA cases to determine whether a plaintiff has a disability under the PWDCRA. *See Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 406 (Mich. 1999). First, the court is to consider whether the plaintiff has a physical impairment. *Id.* Next, it identifies the life activity that the plaintiff is relying upon and determines whether it is a major life activity. *Id.* Finally, the court asks whether the plaintiff's physical impairment "substantially limited the major life activity." *Id.* (citation and quotation omitted).

According to Plaintiff she "does, in fact, have a medical condition that affects hearing[]-

tinnitus." (Plf.'s Resp. 20). The next question, therefore, is whether "hearing" constitutes a major life activity. While Plaintiff has failed to provide any authority on this score, under the ADA–interpreted in a similar manner as the PWDCRA–major life activities include, among other things, "hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also Chmielewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998) ("in interpreting provisions of the [PWDCRA], analogous federal precedents are persuasive, although not necessarily binding."). Plaintiff has thus satisfied the first two elements of a prima facie PWDCRA claim.

In the final step, Plaintiff must, at a minimum, establish a genuine issue of material fact with respect to whether her tinnitus substantially limits her hearing. "Michigan courts have looked to the ADA regulations for guidance as to the meaning of 'substantially limited' for purposed of PWDCRA.'" *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 461 (6th Cir. 2011) (citing *Klimkowski v. Wayne Cnty.*, 1998 WL 1988424, at *4 (Mich. Ct. App.1998) (unpublished per curiam opinion). According to ADA regulations, "substantially limited" means that an individual is "[u]nable to perform a major life activity that the average person in the general population can perform; or . . . [is s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at 461-62; (quoting 29 C.F.R. § 1630.2(j)).

Plaintiff fails to offer any evidence–by way of affidavit, doctor's testimony, or otherwise–in support of the proposition that her hearing is substantially limited by tinnitus.

10

In fact, with respect to the severity of her condition, Plaintiff states only that it "impairs her ability to modulate her own voice level." (Plf.'s Resp. 20). This is a far cry from the type and character of evidence required to proceed beyond the summary judgment phase on a PWDCRA claim. Indeed, the Sixth Circuit, in *MacDonald*, 430 F. App'x at 462, held that, despite the testimony of the plaintiff's doctor, wife, and daughter concerning his memory problems, the "evidence of his disability [was] insufficient to create a genuine issue of material fact as to whether he [satisfied] th[e] definition of 'substantially limited.' " *See also Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 598 (6th Cir. 2002) (abrogated on other grounds) (rejecting argument that doctor's order that the plaintiff needed to take frequent breaks to avoid stress demonstrated a substantial impairment of the plaintiff's ability to work)*; Salim v. MGM Grand Detroit, L.L.C.*, 106 F. App'x 454, 458 (6th Cir. 2004) (holding "that [p]laintiff has not adduced sufficient evidence to show that her diabetes substantially impaired her ability to think and care for herself."). Here, lacking any evidence to substantiate Plaintiff's condition, the Court is left only to guess whether–and to what extent–it interferes with her ability to teach. Accordingly, Plaintiff has failed to raise a genuine issue of material fact sufficient to withstand Defendants' motion for summary judgment.

**V. CONCLUSION**

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED. [41]. This order closes the case in its entirety.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 25, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 25, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager